FYFFE ET AL., APPELLANTS, *v.* JENO'S, INC., APPELLEE.

[Cite as Fyffe *v.* Jeno's, Inc. (1991), 59 Ohio St. 3d 115.]

(No. 90-263 — Submitted January 15, 1991—Decided May 1, 1991.)

*Wolske & Blue* and *Michael S. Miller,* for appellants.

*Vorys, Sater, Seymour & Pease, Thomas M. Taggart* and *J. Scott Jamieson,* for appellee.

HOLMES, J. In this case we are confronted with a rather frequently recurring legal question of what may constitute an "intentional tort" alleged to have been committed by an employer against his employee. We had hoped to resolve this query by this court's trilogy of opinions of *Van Fossen, supra; Kunkler* v. *Goodyear*

*Tire & Rubber Co.* (1988), 36 Ohio St. 3d 135, 522 N.E. 2d 477; and *Pariseau* v. *Wedge Products, Inc.* (1988), 36 Ohio St. 3d 124, 522 N.E. 2d 511, and their progeny. However, some trial courts and attorneys in this state are still in a quandary as to what facts, as pleaded, and as otherwise shown upon a motion for summary judgment pursuant to Civ. R. 56, may overcome such a motion, and present a case with intentional tort issues for the trier of the fact.

All three of the aforementioned opinions were fundamentally premised upon the law set forth within Section 8(A) of the Restatement of the Law 2d, Torts, and Section 8 of Prosser & Keeton on Torts (5 Ed. 1984), and each of these opinions so noted. Therefore, there was no basic difference in the law pronounced in each of those opinions, nor were any different standards used to determine the existence of an "intentional tort." However, since this court's pronouncements upon this subject, a number of elements have surfaced which have occasioned ripples upon the legal waters that a majority of this court fervently hoped had been calmed after *Blankenship* v. *Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St. 2d 608, 23 O.O. 3d 504, 433 N.E. 2d 572, which opinion had judicially espoused the theory in Ohio of an employer's "intentional tort," and *Jones* v. *VIP Development Co.* (1984), 15 Ohio St. 3d 90, 15 OBR 246, 472 N.E. 2d 1046, which had first utilized Section 8(A) of the Restatement of Torts 2d as a definition of such a tort. One element to be considered is that there has been some misinterpretation of certain language in the syllabus in *Van Fossen, supra.* Such misinterpretation, in effect, was that there had to be a showing of actual subjective intent upon the part of the employer to produce the resulting harm to the employee, or that there had to be a finding that the employer had knowledge of the specific harm that might befall the injured employee. In this regard, some individuals may have been confused as to the verbiage in paragraphs five and six of the syllabus in *Van Fossen,* which refers to the knowledge required of the employer in order to create the inference of the intent to commit an "intentional tort." Accordingly, in situations where there was "just a high risk" of harm to the employee or "where the risk is great," there may have been uncertainty as to what culpable mental state the employer possessed. It is argued that some industrial activities that involve a high risk of harm, or where the risk of harm is great, may reasonably encompass situations that fall within the scope of an "intentional tort." We conclude that this is a reasonable argument.

The above referred-to verbiage of the syllabus of *Van Fossen* was not utilized to amend or change the basic law set forth within Section 8(A) of the Restatement of Torts 2d, or Section 8 of Prosser & Keeton on Torts, on this subject. The utilization of this language in the syllabus and in the opinion was written with the hope of providing additional clarification for trial courts and attorneys. That hope apparently has not been uniformly attained.

Within the framework of the quoted syllabus language, acts of the employer that are termed a "high risk" of harm, or "where the risk is great," could, in most instances, correctly be viewed as acts of recklessness. However, in a given instance, and within a certain fact pattern, such acts could equate to one that is substantially certain to result in harm to the employee, and reasonably raise a justiciable issue of an intentional tort. Although this is basically a matter of

semantics, we do not wish a misreading of our syllabus language to result in an unreasonable application of the law. We conclude that a rational approach to eliminating possible misapplications of the law as pronounced within the cited trilogy of cases would be to clarify the language in paragraphs five and six of the syllabus in *Van Fossen.* Accordingly, these paragraphs of that syllabus will now be amended to read:

"5. Within the purview of Section 8(A) of the Restatement of the Law 2d, Torts, and Section 8 of Prosser & Keeton on Torts (5 Ed.1984), in order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.

"6. To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the .employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, pro-

cedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent. (*Blankenship* v. *Cincinnati Milacron Chemicals, Inc.* [1982], 69 Ohio St. 2d 608, 23 O.O. 3d 504, 433 N.E. 2d 572; and *Jones* v. *VIP Development Co.* [1984], 15 Ohio St. 3d 90, 15 OBR 246, 472 N.E. 2d 1046, explained.)"

We point out that this opinion is not meant to materially change the law as set forth in *Van Fossen, Kunkler,* and *Pariseau, supra,* but only to emphasize that the common-law determination of an "intentional tort" shall be in pursuance of the law set forth within Section 8(A) of the Restatement of the Law 2d, Torts.

There is additionally some question as to what facts may, or may not, be considered by the trial court upon motion for summary judgment when reviewing the pleadings and evidence in support of the allegations of an "intentional tort," where an employee is operating certain equipment of the employer. Query: how is evidence tending to show that the employer has deliberately removed a safety guard from the equipment, which occasioned the injury to the employee, to be treated? Is it to be accepted as a rebuttable presumption of the intent of the employer to commit an "intentional tort," or is it to be considered as just one part of the evidentiary picture that has been presented in support of, and contra to, the motion for summary judgment? Our determination is that the latter course should be followed by the trial court.

A public policy statement was made by the General Assembly concerning the removal of safety guards from equipment by employers

in R.C. 4121.80(G)(1), a part of Sub. S.B. No. 307, effective August 22, 1986. This section of law, in pertinent part, states that "[d]eliberate removal by the employer of an equipment safety guard * * * is evidence, the presumption of which may be rebutted, of an act committed with the intent to injure another * * *."

In *Van Fossen, supra,* this court held that R.C. 4121.80(G) concerned a substantive right, and therefore could not be applied retrospectively. In like manner, in *Kunkler, supra,* this court held that R.C. 4121.80(G)(1) could not be applied retrospectively. Here, we must follow *Van Fossen* and *Kunkler,* and hold that the portion of R.C. 4121.80(G)(1) referred to herein, *i.e.,* the rebuttable presumption that an employer intended to commit an intentional tort when a safety guard is deliberately removed, also may not be applied retrospectively.

Although we do not retrospectively apply the rebuttable presumption to this or any other cause of action occurring before the effective date of the statute, we do take note of the public policy statement of the General Assembly in this regard. Accordingly, we hold that where the facts in a given case show that the employer has deliberately removed a safety guard from equipment which employees are required to operate, trial courts may in their determination of motions for summary judgment pursuant to Civ. R. 56, and in the application of our common-law pronouncements of what may constitute an "intentional tort," consider this evidence, along with the other evidence in support of, and contra to, such motion for summary judgment.

We have held in *Van Fossen,* at paragraph seven of the syllabus, that "in an action by an employee against his employer alleging an intentional tort, upon motion for summary judgment by the defendant employer, the plaintiff employee must set forth specific facts which show that there is a genuine issue of whether the employer had committed an intentional tort against his employee."

In determining whether such genuine issues have been set forth for purposes of the motion for summary judgment pursuant to Civ. R. 56, we look at the facts presented by the parties upon the motion for summary judgment.

In the case *sub judice,* Fyffe was a sanitation worker at appellee Jeno's, and on the night of the accident, twenty-two of the fifty-one sanitation employees did not show up for work. Because the crew was shorthanded, Fyffe was "being pushed" to work faster than his normal speed. The shortage of workers also required Fyffe to clean a conveyor system that was not part of his regular duties. It was while he was cleaning this machine that he was injured. In his deposition, Fyffe stated that it was "common practice" to reach into the conveyors to retrieve objects while the conveyor was running; that he had engaged in this practice every night; that "everybody else" reached into the running conveyors to remove foreign objects from the machinery; that he was trained to retrieve objects from the conveyor even if the conveyor was running; and that he was never told not to reach into the conveyor while the conveyor was running.[2] Appellee's safety manager, Robert Peterson, stated that the conveyors were cleaned while they were running "because they clean faster that way." Fyffe indicated that it was "normal" to clean the conveyors while the belt was running.

_____

[2] Some evidence in the record contradicts the statements made by Fyffe.

This conveyor was built by Jeno's and originally had a Plexiglas safety guard which would have prevented an employee such as Fyffe from reaching into the machine. At the time of appellant's injury the Plexiglas safety guard had been removed. Peterson stated that he heard that the safety guards had been removed to make the cleaning easier. Ronald Garvin, Jeno's maintenance supervisor, stated that it was routine procedure to remove the guards each evening before the sanitation crew came on duty. However, Garvin testified that the "machinery is not supposed to be run if the guard is removed." Fyffe stated that his "lead," or supervisor, had shown him how to clean the conveyor belt with the belt running, and that he felt that was a proper way to proceed. In this regard, Fyffe stated: "Like I say, the lead shows you how to clean it. He cleans it with it on so I would say, yeah, it was sanctioned."

Lastly, there was the accident report completed by the supervisory personnel of Jeno's. This document identified the following as some of the "immediate causes" of Fyffe's injuries: "Hazardous methods or procedures planned, condoned or directed by supervision"; "[u]nguarded * * * equipment." The report also contained the question, "How can recurrences of this or similar accidents be prevented?" The answer to this query as set forth by Jeno's supervisors was to "[t]ake belt apart to clean [it] so it does not have to run to be cleaned."

This court observes that upon a motion for summary judgment pursuant to Civ. R. 56, the burden of establishing that the material facts are not in dispute and that no genuine issue of fact exists is on the party moving for the summary judgment. *Harless* v. *Willis Day Warehousing Co.* (1978), 54 Ohio St. 2d 64, 8 O.O. 3d

73, 375 N.E. 2d 46. In deciding whether the trial court correctly granted summary judgment, a reviewing court must follow Civ. R. 56 and view the record in the light most favorable to the party opposing the motion. *Kunkler, supra.*

Here, in construing all the facts within the record, *i.e.,* the pleadings, depositions and other evidence that were before the trial court upon the motion for summary judgment, and all such facts being construed most strongly in favor of the non-moving party, Fyffe, we find that reasonable minds could differ concerning whether or not an intentional tort had been committed by the employer against its employee. Therefore, a genuine issue of fact exists to be presented to the trier of the fact.

Accordingly, the judgment of the court of appeals is reversed and this cause is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment reversed
and cause remanded.*

MOYER, C.J., WRIGHT, H. BROWN and RESNICK, JJ., concur.

SWEENEY and DOUGLAS, JJ., concur in judgment only.

DOUGLAS, J., concurring in judgment only. In my dissenting opinion in *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 120, 522 N.E. 2d 489, 507, I said, in part, that "* * * [w]ith all due respect, I fear that our opinion [*Van Fossen*] will accomplish the seemingly impossible feat of leaving this area of the law more confused than we found it." Through today's majority opinion, that fact is now being conceded and certainly not a moment too soon.

As is now being recognized by the majority, it is apparent from a number of cases recently coming before us that *Van Fossen* is being interpreted by many courts in this state in a manner which virtually precludes employees from prosecuting intentional tort claims against their employers. Such an interpretation of *Van Fossen* is understandable given the language contained in paragraphs five and six of the syllabus which suggests that if an employer *knowingly* subjects his or her employees to a "high" or "great" risk of harm, such conduct may *not* be considered intentional. The problem is, however, how "high" or "great" must a risk be before it can be said that the creation of the risk is substantially certain to produce injury? How high is "high"? How great is "great"?

*Van Fossen,* of course, does not answer these questions but, rather, serves to confuse the distinctions between recklessness on the one hand and intentional conduct on the other hand. In now "modifying" *Van Fossen* by removing such imprecise terms, the majority has taken an admirable first step in reestablishing that the test for "substantial certainty" is that found in Section 8A of 1 Restatement of the Law 2d, Torts (1965) 15. However, in doing so, the majority makes the following comments:

"Within the framework of the quoted syllabus language, acts of the employer that are termed a 'high risk' of harm, or 'where the risk is great,' could, in most instances, correctly be viewed as acts of recklessness. However, in a given instance, and within a certain fact pattern, such acts could equate to one that is substantially certain to result in harm to the employee, and reasonably raise a justiciable issue of an intentional tort. Although this is basically a matter of semantics, we do not wish a misreading of our syllabus language to result in an unreasonable application of the law. We conclude that a rational approach to eliminating possible misapplications of the law * * * would be to delete the above-quoted language in paragraphs five and six of the syllabus in *Van Fossen.*"

The majority's above-quoted "explanation" of what this court meant in *Van Fossen* contains the very same language that today's majority realizes has caused so many problems in the determination of whether an act is "substantially certain" to produce injury. In this vein, I fear that today's majority opinion will perpetuate the confusion caused by *Van Fossen.* Furthermore, if, as conceded by the majority, "semantics" is the problem, then maybe we should resurrect for this purpose that workable, satisfactory and time-honored principle of law — "probability versus possibility." If an injury is the *probable* consequence of an act, then the act was substantially certain to have produced the injury. If an injury is *not* the probable consequence of an act, then the act creates only the possibility of injury and the act is either reckless or negligent — but not intentional.

Finally, I write separately to point out that no matter how vehemently the majority trumpets its belief that today's opinion does not change the law of "intentional tort" liability, any knowledgeable reader need only compare the *facts* in the case at bar to, for instance, this court's opinion in *Pariseau* v. *Wedge Products, Inc.* (1988), 36 Ohio St. 3d 124, 522 N.E. 2d 511, in order to recognize that today's majority has substantially changed the position of this court.

SWEENEY, J., concurs in the foregoing opinion.